**CONTINUATION OF AN APPLICATION FOR A SEARCH WARRANT**

I, Heather Williamson, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this continuation of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—a cellular telephone, as described in Attachment A ("the Subject Device")—that is currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Device, as described in Attachment B.

2. I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been since January 2013. I am currently assigned to the Grand Rapids District Office. Previously, I was assigned to the Southwest Border Initiative Group-3 ("SWB-3") and to the Los Angeles Strike Force for approximately six years. The Los Angeles Strike Force is an investigative group jointly led by the DEA and FBI, and composed of several other federal, state, and local agencies that is focused on the disruption of the Mexico-based Sinaloa Cartel. Prior to working as a DEA Special Agent, I completed 20 weeks of training at the DEA Academy in Quantico, Virginia, which included narcotics identification, detection, trafficking, and interdiction; money laundering techniques; asset identification, seizure, and forfeiture; and techniques used by narcotics traffickers to avoid detection by law enforcement officials. I have investigated drug trafficking organizations in relation to violations of federal laws such as unlawful importation of controlled substances,

the distribution of controlled substances, manufacturing controlled substances, and possession with intent to distribute controlled substances, including cocaine, methamphetamine, heroin, and other dangerous drugs, as well as money laundering.

3. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect (lingo) and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money laundering, conspiracy to do the same, and attempts to do the same, in violation of Title 18, United States Code, Sections 1956 and 1957.

4. I know from training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions. Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers, customers, and confederates. Mobile telephones are portable and phone providers often do not require purchasers or users of the devices to provide their true names and/or

addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement. Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of narcotics, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time.

5. Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically Title 21, United States Code, Sections 841 and 846, conspiracy to distribute and possess with intent to distribute controlled substances, will be found on the Subject Device, described in Attachment A. The categories of electronically stored information and evidence sought are described in Attachment B.

6. The information set forth in this continuation is based upon my personal knowledge and participation in the investigation described below, as well as information provided to me by other law enforcement officers. I have not set forth all of the information known to me or known to other law enforcement officers concerning this matter. This continuation is intended to show only that there is sufficient probable cause for the requested search warrant.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

7. The property to be searched is a black Apple iPhone 11 seized by law enforcement on October 19, 2020 from the possession of JACKIE LEE CHERRY, JR., hereinafter the "Subject Device." The Subject Device is currently located at the DEA's

Grand Rapids Resident Office, 330 Ionia Avenue NW, Grand Rapids, Michigan, 49501.

8. The applied-for warrant would authorize the forensic examination of the Subject Device for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

9. Beginning in December 2019, DEA, Michigan State Police (MSP) and the MSP Southwest Enforcement Team (SWET) conducted a joint investigation into a crystal methamphetamine distribution conspiracy in the Western District of Michigan. As a result of this investigation, a federal grand jury has returned indictments against seven individuals that include violations of 21 U.S.C. §§ 841, 846, and 18 U.S.C. § 922(g). Case Nos. 1:20-cr-154, 155, 156.

10. During the investigation, through confidential source information, controlled purchases, physical surveillance, and electronic surveillance, investigators identified JACKIE LEE CHERRY, JR. as a source of supply (SOS) for crystal methamphetamine in Muskegon, Michigan. CHERRY's criminal history includes convictions for domestic violence, operating suspended/revoked license, possession of marijuana, assault and battery, 4th degree criminal sexual conduct, resisting/obstructing a police officer, and receiving/concealing firearms.

11. On October 19, 2020, at approximately 9:28 a.m., investigators initiated surveillance on a 2018 Chevrolet Silverado bearing Michigan license plate EGV 9493. The Silverado is registered to CHERRY at 2117 Maffett Street ("Maffett Residence")

in the City of Muskegon Heights, Michigan. Investigators located the vehicle at the Quality Inn at 1675 East Sherman Boulevard, Muskegon. At approximately 11:15 a.m., investigators observed CHERRY driving the Silverado and travel to the Maffett Residence. Investigators maintained surveillance on the Maffett Residence after CHERRY went inside.

12. At approximately 2:10 p.m., WEMET CS[1] contacted CHERRY on 231-571-8506. CHERRY said he would sell the CS approximately 3 ounces of crystal methamphetamine for $500 per ounce. CHERRY agreed to come to the location of the CS for the drug deal.

13. Subsequently, investigators maintained surveillance on the Maffett Residence, with the assistance of air support, and observed CHERRY exit the residence and get into a 2008 Chevrolet Tahoe bearing Michigan license plate DZU 0204. The Tahoe is registered to Mary Cherry (CHERRY's wife) at the Maffett Residence. While driving the Tahoe, officers observed CHERRY conduct counter-surveillance, to include making several quick turns.

14. Shortly thereafter, a marked MSP Trooper initiated a traffic stop on the

---

[1] CS has been a cooperating informant with WEMET since October 7, 2019. CS began cooperating with law enforcement for consideration on a pending criminal charge. As of August 24, 2020, the criminal charge was dismissed, and the CS is currently being compensated financially for his/her information. CS's criminal history includes convictions for felony malicious destruction of property, possession of cocaine, misdemeanor larceny, domestic violence, traffic violations, assault, and possession of marijuana. CS has conducted three controlled buys, ultimately resulting in the execution of one search warrant. CS has also provided intelligence and information on several Muskegon-based drug traffickers. Based on these results, WEMET believes CS to be reliable.

Tahoe driven by CHERRY for a window tint violation and based on investigators' belief that CHERRY was in possession of multiple ounces of crystal methamphetamine with the intent to deliver to the CS.

15. An MSP K9 executed a sniff around the outside of the Tahoe and the K9 indicated interest at the outside of the driver's side of the vehicle. A subsequent search of the Tahoe resulted in the seizure of approximately 147 grams (over 5 ounces) of a substance that field tested positive for methamphetamine.

16. Based on my training and experience, I know that 5 ounces of methamphetamine is a distribution quantity, and based on my knowledge of the investigation and events that day, I believe CHERRY intended to distribute at least some of that methamphetamine to the CS.

17. Incident to CHERRY's arrest, officers seized the Subject Device from CHERRY's possession. Investigators believe CHERRY used the Subject Device to arrange the drug deal with the CS.

18. On October 20, 2020, this Court issued a Criminal Complaint and federal arrest warrant for CHERRY based on the above information, charging him with possession with intent to distribute 50 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii).  Case No. 1:20-mj-434.

19. Subsequent to the lawful seizure of the Subject Device incident to CHERRY's arrest, it has remained in the lawful possession of the DEA. Therefore, while investigators might already have all necessary authority to examine the

Subject Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Subject Device will comply with the Fourth Amendment and other applicable laws.

20. The Subject Device is currently in storage at the DEA, 330 Ionia Avenue NW, Grand Rapids, Michigan 49501. In my training and experience, I know that the Subject Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of law enforcement on October 19, 2020.

## TECHNICAL TERMS

21. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and

storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on

the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the

>   Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.
>
>   f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

22. Based on my training, experience, and research, I know that the Subject Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, and GPS navigation device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

24. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Subject Device because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.

    Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

  26. *Manner of execution.* Because this warrant seeks only permission to examine the Subject Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

27. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Subject Device described in Attachment A to seek the items described in Attachment B.